CHICAGO, B. & Q. R. CO. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. February 28, 1912.)

No. 3,637.

(Syllabus by the Court.)

1. CARRIERS (§ 204*)—28-HOUR LAW—"ACCIDENTAL CAUSE" OR "UNAVOIDABLE CAUSE"—"DUE DILIGENCE AND FORESIGHT"—"WILLFULLY."
    The measure of "due diligence and foresight" is that diligence and foresight which persons of ordinary prudence and care commonly exercise

under similar circumstances. And the due diligence and foresight which condition the anticipation and avoidance of the other incidental or unavoidable causes specified in the 28-hour law is that degree of diligence and foresight which reasonably prudent and careful men ordinarily exercise under like circumstances.

An "accidental or unavoidable cause" which cannot be avoided by the exercise of due diligence and foresight in the meaning of this law is a cause which reasonably prudent and careful men, under like circumstances, do not and would not ordinarily anticipate, and whose effects under similar circumstances they do not and would not ordinarily avoid.

"Willfully" means "purposely or obstinately, and is designed to describe the attitude of a carrier who, having a free will or choice, either intentionally disregards the statute or is plainly indifferent to its requirements."

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 927; Dec. Dig. § 204.*

For other definitions, see Words and Phrases, vol. 1, pp. 62–70; vol. 8, p. 7560; vol. 3, pp. 2223–2225; vol. 8, pp. 7643, 7149, 7468–7481, 7835, 7836.]

2. CARRIERS (§ 37*)—28-HOUR LAW—EVIDENCE—CONCLUSION.

A train load of 17 cars of sheep started at 5 in the morning to make a run which ordinarily requires 11 hours. This train and its drawbars were inspected and found in good condition on the morning it started. In order to unload the sheep in time, it was necessary that this train should make the run in 12 hours. It was delayed about 2 hours by the breaking of a drawbar and chain of a train which met and passed it, by the slipping of a knuckle in the coupler which separated it into two parts and by the pulling out of two drawbars in its cars which made it necessary to draw the two parts of the train upon a side track and recouple them. Upon its arrival the company dragged the sheep out of two of the cars in the dark within the 36 hours, but left 15 of the cars unloaded until the next morning after the expiration of the 36 hours.

*Held*, there was no substantial evidence that the company willfully violated the law, and there was substantial evidence that it was prevented from unloading the sheep within the 36 hours by accidental or unavoidable causes which could not be anticipated or avoided by the exercise of due diligence and foresight.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. § 37.*

Liability of carrier for failure to feed, water, and rest live stock and for violation of the 28-hour law, see note to St. Joseph Stockyards Co. v. United States, 110 C. C. A. 435.]

In Error to the District Court of the United States for the District of Nebraska.

Action by the United States against the Chicago, Burlington & Quincy Railroad Company. Judgment for the United States, and defendant brings error. Reversed and remanded.

Arthur R. Wells (James E. Kelby, on the brief), for plaintiff in error.

F. S. Howell, U. S. Atty.

Before SANBORN and CARLAND, Circuit Judges.

SANBORN, Circuit Judge. In an action against the railroad company under the 28-hour law, Act June 29, 1906, c. 3594, 34 Stat. 607 (U. S. Comp. Stat. Supp. 1907, p. 918; Supp. 1909, p. 1178), in which the defenses were that the company did not knowingly and

willfully violate the law and that it was prevented from complying with it by accidental or unavoidable causes which could not be anticipated or avoided by the exercise of due diligence and foresight, the court below instructed the jury to return a verdict for the plaintiff, and this ruling is specified as error.

Section 1 of the Act of June 29, 1906, provides that no railroad company engaged in the interstate transportation of sheep and other like animals shall confine them in cars more than 28 hours, without a request from the owner or person in custody, and then not more than 36 hours, "unless prevented by storm or by other accidental or unavoidable causes which cannot be anticipated or avoided by the exercise of due diligence and foresight." And section 3 declares:

"That any railroad company which knowingly and willfully fails to obey this prohibition shall pay a penalty of not less than $100.00 nor more than $500.00."

[1] The measure of "due diligence and foresight" is that diligence and foresight which persons of ordinary prudence and care commonly exercise under similar circumstances. And the due diligence and foresight which condition the anticipation and avoidance of the other accidental or unavoidable causes described in this law is that degree of diligence and foresight which reasonably prudent and careful men ordinarily exercise under similar circumstances. An "accidental or unavoidable cause" which cannot be avoided by the exercise of due diligence and foresight within the meaning of this law is a cause which reasonably prudent and cautious men under like circumstances do not and would not ordinarily anticipate and whose effects under similar circumstances they do not and would not ordinarily avoid. The Olympia, 61 Fed. 120, 127, 9 C. C. A. 393; United States v. Kansas City Southern Ry. Co. (D. C.) 189 Fed. 471, 477; Southern Pacific Company v. Hetzer, 135 Fed. 272, 281, 283, 284, 68 C. C. A. 26, 35, 37, 38, 1 L. R. A. (N. S.) 288; Chicago Great Western Ry. Co. v. Egan, 159 Fed. 40, 45, 86 C. C. A. 230, 235.

The shipment consisted of 17 double-decked cars of sheep. They had been confined in the cars about 18 hours when, at 5 in the morning on August 7, 1909, they started from Alliance for Aurora, which was 220 miles distant. The time ordinarily required for a freight train to make this run was 11 hours, and if it followed the usual course it would arrive by 6 or 7 in the afternoon. There were feeding pens where these sheep could be unloaded, fed, and rested at Alliance and at Aurora, but none properly equipped for the feeding and resting of this shipment between these stations and as sheep cannot be unloaded with facility on dark nights it was necessary, in order to prevent their confinement beyond the 36 hours during which the owner had requested their confinement, that they should arrive in Aurora by 7 in the afternoon, for it became dark about 8:30 or 9 p. m., and an hour and a half or two hours were required to unload them. This train was unavoidably delayed about two hours by this series of accidents. It was running east and was scheduled to pass freight No. 1918, which was coming west, at Birdsell. Train No. 1918 broke a drawbar at a station east of Birdsell, and when it had been chained

together again it broke the chain, and these accidents delayed its arrival at Birdsell so much that it delayed the sheep train there 30 minutes. At Reno, a station east of Birdsell, the knuckle of one of the automatic couplers in the sheep train slipped by, the train broke into two parts, the train crew were compelled to haul these parts onto a sidetrack, couple them together, permit a passenger train, that was some distance behind them, to pass and were then compelled to wait until this passenger train cleared the block before they proceeded, so that this accident delayed their train about 25 minutes. A quarter of a mile west of the station of Weir the sheep train pulled out two drawbars, one next to the engine and the other farther back in the train, and its crew was compelled to chain the forward part of the train to the engine and to draw it onto a side track at the station and then to go back and haul the rear part of the train to the same place and to couple them together again, and this accident delayed the train 55 minutes.

There is no evidence that any of these delays were caused by the negligence of the company or of its servants. There is undisputed testimony that the sheep train and its drawbars were inspected at Alliance, and that they were in good condition, that drawbars sometimes pull out and knuckles in automatic couplers sometimes slip by, that it is impossible to prevent such occasional accidents, and that the train dispatcher could not, from his practical experience, undertake to calculate when a train would be delayed by reason of the pulling out of drawbars. Such an unusual series of accidents, the pulling out of three drawbars, the breaking of a chain, and the slipping of a knuckle, causing three successive delays, is not the natural and probable effect of running a freight train 11 hours, and hence it is not conclusive proof of a lack of due diligence and foresight for the operators of trains to fail to anticipate it and to run the train on the theory that it will not occur.

There was no negligence in the failure to provide feeding pens between Alliance and Aurora for such loads of sheep or cattle, because only 11 hours were required to make the run.

There were three or four loading and unloading chutes and pens between the stations of Alliance and Aurora into each of which three or four cars could have been unloaded; but there is no evidence that the sheep in these 17 cars could have been unloaded and provided with food, water, and rest in these small pens at the way stations after the delays mentioned had occurred and before darkness fell on August 7, 1909. This was a through shipment, and the failure to unload the sheep under these circumstances at these way stations constituted no lack of due diligence to avoid the causes and effects of the delays.

[2] The conclusion is that the preponderance of the evidence in this case was that the railroad company was prevented from unloading these sheep within the 36 hours by accidental causes which could not be anticipated or avoided by that due diligence and foresight which reasonably prudent and careful men ordinarily exercise in like circumstances, and that there was not only no conclusive, but no sub-

stantial, evidence that it knowingly and willfully failed to comply with the law.

"Willfully" means "purposely or obstinately, and is designed to describe the attitude of a carrier who, having a free will or choice, either intentionally disregards the statute or is plainly indifferent to its requirements." St. Louis & S. F. Ry. Co. v. United States, 169 Fed. 69, 71, 94 C. C. A. 437. There is no proof of any such attitude on the part of this carrier. The natural and probable result of sending this train of sheep out of Alliance at 5 a. m. on August 7th was that it would arrive at Aurora and the sheep would be unloaded before dark on the afternoon of that day. Unforeseen and independent accidental causes, which reasonably prudent men under like circumstances do not anticipate and would not have anticipated under the circumstances of this case, turned aside the ordinary and natural flow of events and wrought an unexpected. delay of the train. When this delay had occurred, the railroad company rushed it to Aurora at the rate of 28 miles an hour, and when it arrived there spent two hours dragging the sheep out of two of the cars in the dark until its servants became so exhausted that they could not continue the work. It was then suspended until daylight, when in an hour and a half the sheep walked out of the remaining 15 cars. Because there was no substantial evidence in this case of a willful violation of the law by the company, and because there was substantial evidence that it was prevented from unloading the sheep in due time by accidental causes which could not be anticipated or avoided by the exercise of due diligence and foresight, the judgment below is reversed, and the case is remanded to the court below, with directions to grant a new trial.